Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| L.F., individually and on behalf of I.R. a minor,<br><br>       Plaintiff,<br><br>vs.<br><br>ROCKY MOUNTAIN HOSPITAL and MEDICAL SERVICE, INC. D/B/A ANTHEM BLUE CROSS and BLUE SHIELD,<br><br>       Defendant. | COMPLAINT<br><br>Case No. 2:22-cv-00420 - DAK |

Plaintiff L.F., individually and on behalf of I.R. a minor, through her undersigned

counsel, complains and alleges against Defendant Rocky Mountain Hospital and Medical

Service, Inc. D/B/A Anthem Blue Cross and Blue Shield ("Anthem") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. L.F. and I.R. are natural persons residing in Boulder County, Colorado. L.F. is I.R.'s

    mother.

2. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield

   Association, and was the insurer and claims administrator, as well as the fiduciary under

   ERISA for the insurance plan providing coverage for the Plaintiff ("the Plan") during the

   treatment at issue in this case.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et.*

   *seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). L.F. was a

   participant in the Plan and I.R. was a beneficiary of the Plan at all relevant times. L.F.

   and I.R. continue to be participants and beneficiaries of the Plan.

4. I.R. received medical care and treatment at Change Academy Lake of the Ozarks

   ("CALO") beginning on May 29, 2020. CALO is a licensed residential treatment facility

   located in Missouri, which provides sub-acute inpatient treatment to adolescents with

   mental health, behavioral, and/or substance abuse problems. CALO specializes in the

   treatment of individuals with attachment related disorders.

5. Anthem denied claims for payment of I.R.'s medical expenses in connection with his

   treatment at CALO.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C.

   §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on

   ERISA's nationwide service of process and venue provisions, and because Anthem does

   business in Utah through its network of affiliates.

8. In addition, the Plaintiff has been informed and reasonably believes that litigating the

   case outside of Utah will likely lead to substantially increased litigation costs she will be

   responsible to pay and that would not be incurred if venue of the case remains in Utah.

Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both

her and I.R.'s privacy will be preserved.

9.  The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the

benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's

violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29

U.S.C. §1132(g).

## BACKGROUND FACTS

### I.R.'s Developmental History and Medical Background

10. For the first two and a half years of his life I.R. lived in an orphanage in Kazakhstan in

central Asia. He had limited interaction beyond the other children there and the limited

amount of attention his caregivers were able to give him.

11. While the orphanage was able to attend to his physical needs, he was deprived of all but

the most basic and intermittent human contact which led to delayed developmental

milestones, and since he wasn't spoken to often, delayed speech and language recognition

as well.

12. I.R. was malnourished and was described in the report from orphanage staff as a

"coward" because he spent much of his time crying and was intimidated by the other

children who often behaved aggressively.

13. L.F. was able to spend some time with him while an adoption was finalized, but I.R. developed attachment issues and would often panic if L.F. was out of sight even if it was just to go for a walk or to the grocery store.

14. I.R. was suspicious of men and would grow very jealous if L.F. spent any time with his older brother. I.R. hated being alone and was unable to sleep by himself and usually had to sleep in his parents' bed with them.

15. He often got in trouble at school and struggled managing even the most basic of tasks. I.R. started attending a private school and although this seemed to help, he continued to struggle both emotionally and academically. I.R. felt rejected by his peers when they declined to spend time with him outside of school.

16. He attended numerous types of therapy and had a neuropsychiatric evaluation which revealed that he suffered from numerous conditions such as ADHD, dysgraphia, dyscalculia, working memory deficits, executive functioning deficits, anxiety, and reactive attachment disorder.

17. I.R. stole money from his parents and he started spending time with older children and vaping, drinking alcohol, and smoking marijuana. He started telling others that he was planning on hurting himself.

18. He was bullied by his peers and started refusing to go to school. When I.R. was given any sort of critical feedback he would become withdrawn and state that he was convinced that something was fundamentally wrong with him.

19. On one occasion, I.R. broke into a locked medicine cabinet and overdosed on medications in a suicide attempt. He was then taken to the hospital and then received acute psychiatric care.

20. I.R. would often become physically aggressive when dysregulated and would do things like punch walls or attack his brother or parents.

21. I.R. continued to abuse drugs and again overdosed. He was taken to the hospital and stated that he had wanted to get high but he was also trying to hurt himself.

22. I.R. started using harder drugs with his friends such as cocaine, ketamine, acid, mushrooms, and anything else he was able to acquire.

23. I.R. related a story about someone he knew being threatened with a gun by some "college kids" over some drugs, but when questioned by police, this person stated that I.R. was actually the person who had threatened to come by with a gun and that I.R. had posted on his social media that he had killed someone with a gun recently. I.R. denied this and said that he didn't even have a gun.

24. I.R.'s psychiatrist confronted I.R. over his behaviors, to which I.R. reacted very negatively and then refused to continue meeting with his psychiatrist.

25. I.R.'s psychiatrist expressed great concern about I.R.'s safety and stated that I.R.'s life was at risk and his drug abuse was liable to follow him for the rest of his life or he was likely to end up overdosing without long-term intensive care in a residential treatment program.

### CALO

26. I.R. was admitted to CALO on May 29, 2020, with Anthem's approval.

27. In a letter dated June 26, 2020, Anthem denied payment for I.R.'s treatment at CALO from June 20, 2020, through July 2, 2020. The letter stated in pertinent part:

> The request tells us you went to a residential treatment center for your mental health condition. The program asked to extend your stay. The plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a

danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show you are a danger to yourself or others, or that you are having serious problems functioning. For this reason, the request is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (Org: B-902-RES). …

This plan may be subject to the protections provided under the Mental Health Parity and Addiction Equity Act (MHPAEA). Coverage provided for mental health and substance use disorders must be comparable to services covered under the medical benefits available on this plan.

28. On March 24, 2021, L.F. submitted an appeal for the denial of payment for I.R.'s treatment from June 20, 2020, forward. L.F. noted that Anthem had not listed the correct dates of service in the denial and asked it to correct the error and consider all of the relevant dates of I.R.'s treatment, not just those up until July 2, 2020.

29. L.F. reminded Anthem that she was entitled to certain protections under ERISA during the review process including a full, fair, and thorough review conducted by appropriately qualified reviewers, which took into account all of the information she provided, and which gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the determination was based, and which gave her the information necessary to perfect the claim.

30. She asked that the reviewer have experience treating individuals with I.R.'s diagnoses and that they be trained in the details of MHPAEA so that they could appropriately address the arguments she raised in the appeal. She also asked for a physical copy of all

documentation related to the initial determination as well as the appeal decision, including case notes.

31. She wrote that while Anthem purported to have utilized the MCG Residential Behavioral Health Level of Care, Child or Adolescent criteria, it had not applied them properly. She quoted the discharge guidelines and argued that I.R. did not meet these guidelines and was unable to function at a lower level of care.

32. She also contended that the MCG criteria themselves violated generally accepted standards of medical practice. She argued that among other things they required acute level symptoms for a sub-acute level of care, failed to err on the side of caution when there was ambiguity, pushed individuals into a lower level of care whether or not this was safe or effective, failed to take into account the unique needs of children and adolescents, and evaluated the necessity of treatment based largely on a list of mandatory prerequisites.

33. She stated that subacute facilities like residential treatment centers "are not expected to treat, nor are they equipped to handle patients at risk of acute dangerousness." She argued that Anthem had not taken the failure of less intensive treatment programs into account, nor had it adequately assessed the complexity of I.R.'s diagnoses or how they aggravated each other.

34. She noted that while the MCG criteria Anthem used were ostensibly for children and adolescents, they largely appeared to be word for word, the exact same criteria as those used for adults. She argued that this showed that the criteria failed to take the unique needs of children and adolescents into account when assessing the appropriate level of care.

35. L.F. asked the reviewer to utilize the Plan's definition of medical necessity rather than any other criteria when evaluating I.R.'s treatment. She said that if this was done, the reviewer would see that I.R.'s treatment was not only medically necessary but also offered in accordance with generally accepted standards and that CALO was the most appropriate setting and level of service where treatment could be provided safely and effectively.

36. She contended that Anthem's denial was a violation of MHPAEA. She wrote that MHPAEA compelled insurers to offer coverage for mental health services at parity with comparable medical and surgical services. She identified skilled nursing, inpatient rehabilitation, and hospice facilities as some of the medical or surgical analogues to the residential treatment I.R. received.

37. She identified two primary ways in which Anthem violated MHPAEA. The first was Anthem's requirement that residential treatment be evaluated according to the MCG criteria while not requiring analogous medical or surgical facilities to meet any such similarly restrictive criteria.

38. She asked that if Anthem did indeed possess such medical or surgical criteria that it provide her with physical copies of them.

39. The second example of a violation of MHPAEA that she offered was Anthem's requirement that individuals receiving non-acute residential treatment exhibit acute level symptoms such as a risk of harm to self or others, but not requiring this for subacute medical or surgical services.

40. She argued that Anthem was intentionally employing criteria that limit the scope or duration of benefits for mental health services and argued that this constituted a non-quantitative treatment limitation in violation of MHPAEA.

41. She argued that she was entitled to relief under MHPAEA as she had demonstrated:

    (1) The relevant group health plan is subject to the Parity Act;
    (2) The plan provides both medical/surgical benefits and mental health or substance use disorder benefits;
    (3) The plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and
    (4) The mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared.

42. She requested that Anthem perform a parity analysis to determine whether the Plan was compliant with MHPAEA and asked to be provided with physical copies of the results of this analysis including specific information on the limitations she alleged Anthem had applied, and any evidence Anthem had that these limitations were not applied more stringently to medical or surgical care.

43.  She contended that I.R.'s diagnosis of reactive attachment disorder was particularly difficult to treat and that I.R. needed specific treatment in a residential treatment center to adequately address his condition. She included research articles about the benefits of residential treatment for individuals like I.R who suffered from reactive attachment disorder and other conditions he experienced such as chronic pain.

44. She wrote that if Anthem refused to cover I.R.'s treatment it was preventing him from learning effective coping mechanisms and was likely only causing future treatments to be more expensive and could even end up costing I.R. his life.

45. She included a letter of medical necessity dated October 5, 2020, from Larry Mortazavi, MD, CGP, with the appeal which stated in part:

9

[I.R.] (Date of birth [redacted]) was in my care for medication management and psychotherapy at Insightful Attachment between February 2020 and June 2020. I met [I.R.]'s parents to initiate a comprehensive psychiatric evaluation in February 2020 shortly after his psychiatric hospitalization due to overdose and possible suicide attempt. After meeting with the parents and [I.R.] several times, the evaluation was completed on 4/7/2020. The evaluation confirmed previously known psychiatric issues: severe ADHD, combined type, severe learning disability and substance use (mostly cannabis, but also occasional use of opioids and benzodiazepines). In addition to neurodevelopmental issues and substance use, psychiatric issues in the form of emerging personality disorder were noted. [I.R.]'s first 2 years of childhood, which are essential for creating secure attachments, were in an orphanage in Kazakhstan without any meaningful, persistent, and available relationship with a care giver. The insecure and disorganized attachment style led to narcissistic defenses that explains [I.R.]'s struggles with authorities, following rules, and being empathic to others. [I.R.] often represses his emotions by doing drugs and being engaged in high risk behavior. I suggested to begin intensive psychotherapy with high frequency (3-4 times a week) along with medications with hopes that we could stabilize him in an outpatient setting. Unfortunately, [I.R.] could not comply with the treatment frame. He skipped sessions frequently.

He was using drugs impulsively. Another hospitalization happened on April 16, 2020, which was due to a suicide attempt. The frequency of high-risk behavior increased by May 2020. He threatened to attack a peer with a gun. When he was confronted, he did not show any remorse and did not take any responsibility. [I.R.] was leaving the house without parental permission, and did not return home at night. He was not compliant with medications (a combination of Venlafaxine, ER, 150 mg, daily and Seroquel, 100 mg, at bedtime) and abused his ADHD medication by giving it to his friends. Parents could not enforce any rules without having highly volatile and aggressive altercations with him. [I.R.] was not attending online school either. He stopped coming to psychotherapy sessions by mid May 2020. At this point, it was clear that outpatient setting [sic] could not address these profoundly concerning issues. His safety and safety of others were at risk. Children with history of early childhood trauma require a highly structured environment to work with attachment-based psychotherapists, both individually and in group settings to recover and function in their families and communities. Hence, I strongly recommended a residential treatment for [I.R.] and worked with his parents to gain their agreement for the necessity of such treatment. [I.R.]'s parents were heart broken and at first quite resistant, but eventually they agreed that this treatment is the only way to save [I.R.]'s life and get him to work on his issues. [I.R.] eventually was admitted to Calo Teen which is attachment based residential treatment for adolescents.

46. L.F. wrote that there were no appropriate in-network treatment facilities in Colorado and

the treatment at CALO was appropriate as it was specifically tailored toward children

10

who were struggling with attachment related issues. She attached copies of I.R.'s medical records with the appeal.

47. In the event the denial was upheld L.F. asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination, along with their medical or surgical equivalents (whether or not these were used to evaluate the claim) along with any other reports or opinions concerning the claim from any physician or other professional along with their names, qualifications, and denial rates. (collectively the "Plan Documents")

48. She asked that if Anthem did not possess these documents or was not acting on behalf of the Plan Administrator in this regard that it forward her request to the appropriate entity.

49. When L.F. received no response to the appeal even though delivery had been confirmed, she filed a complaint with the Colorado Division of Insurance on May 27, 2021, and asked it to compel Anthem to "comply with the terms and conditions of my plan."

50. In a letter dated June 23, 2021, Anthem responded to the complaint and stated that it had received the appeal but "your appeal case was closed in error before getting sent to the Grievance and Appeals department for review." The letter stated that L.F.'s appeal had been reopened for an expedited review.

51. In a letter dated June 25, 2021, Anthem upheld the denial of payment for I.R.'s treatment. The dates of service listed in the letter reveal that in spite of L.F.'s explicit request, the reviewer only considered dates of service from June 20, 2020, through either June 30,

11

2020, or July 2, 2020 (the letter contradicts itself and lists both dates as the end date). The

reviewer gave the following justification for the denial:

> We reviewed all the information that was given to us before with the first request
> for coverage. We also reviewed all that was given to us for the appeal. Your
> doctor wanted you to stay longer in residential treatment center care. You were
> getting this because you had been at risk for serious harm without 24 hour care.
> We understand that you would like us to change our first decision. Now we have
> new information from the medical record plus letters. We still do not think this
> was medically necessary for you. We believe our first decision is correct for the
> following reason: after the treatment you had, you were no longer at risk for
> serious harm that needed 24 hour care. You could have been treated with
> outpatient services. We based this decision on the MCG guideline Residential
> Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

52. The Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan

and ERISA.

53. The denial of benefits for I.R.'s treatment was a breach of contract and caused L.F. to

incur medical expenses that should have been paid by the Plan in an amount totaling over

$490,000.

54. Anthem failed to produce a copy of the Plan Documents or the other materials L.F.

requested including any medical necessity criteria for mental health and substance use

disorder treatment and for skilled nursing or rehabilitation facilities in spite of L.F.'s

request.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

55. ERISA imposes higher-than-marketplace quality standards on insurers and plan

administrators. It sets forth a special standard of care upon plan fiduciaries such as

Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing

solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C.

12

§1104(a)(1).

56. Anthem and the Plan failed to provide coverage for I.R.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

57. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

58. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the Plaintiff's appeals or whether it provided her with the "full and fair review" to which she is entitled. Anthem failed to substantively respond to the issues presented in L.F.'s appeal and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

59. In fact, after it was compelled to issue a response to L.F.'s appeal, Anthem's denial essentially consists of a single sentence, "after the treatment you had, you were no longer at risk for serious harm that needed 24 hour care."

60. Anthem made no attempt to elaborate on this point, did not address any of the arguments L.F. raised, did not provide her with the materials she requested, and appears to have limited its review to the first ten or twelve days of denied treatment, despite L.F.'s explicit request that it correct this same error that it also made in its initial denial.

61. Anthem and the agents of the Plan breached their fiduciary duties to I.R. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in I.R.'s interest and for the exclusive purpose of providing benefits to ERISA

participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of I.R.'s claims.

62. The actions of Anthem and the Plan in failing to provide coverage for I.R.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

63. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

64. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

65. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

66. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of

14

benefits for mental health or substance use disorder treatment. 29 C.F.R.

§2590.712(c)(4)(ii)(A), (F), and (H).

67. The medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

68. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for I.R.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

69. For none of these types of treatment does Anthem exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

70. The Departments of Labor and Health and Human Services jointly compiled a list of "warning signs" which often accompany a violation of MHPAEA. One such sign of a likely MHPAEA violation is the requirement of improvement for mental health services, but not for medical or surgical services.

71. Anthem's initial denial letter states that an individual receiving residential treatment "is expected to either improve with this care, or to keep from getting worse." Plaintiff is not aware of any such similar requirement of improvement for comparable medical or surgical services to be approved.

15

72. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

73. Anthem and the Plan evaluated I.R.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

74. L.F. identified two primary examples of the disparate application of medical necessity criteria between medical/surgical and mental health treatment. One of these was Anthem's reviewers' improper utilization of acute medical necessity criteria to evaluate the non-acute treatment that I.R. received. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as:

> The plan clinical criteria considers [sic] ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care.

75. The letter stated that Anthem could also consider treatment necessary for individuals exhibiting severe behavioral problems such as a refusal to eat or sleep. Residential treatment is likewise inappropriate for individuals exhibiting symptoms such as these.

76. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that I.R. received.

77. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

16

78. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

79. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

80. Anthem's use of acute criteria is also evident in the MCG discharge criteria for residential treatment quoted by the Plaintiff.

81. Among other requirements, the Anthem criteria state that an individual should not be discharged unless danger to self or others is manageable as indicated by one of the following:

- Absence of Thoughts [sic] of suicide, homicide, or serious Harm [sic] to self or to another.
- Thoughts of suicide, homicide, or serious Harm [sic] to self or to another present but manageable at available lower level of care.

82. The other example of a treatment limitation identified by L.F. was her contention that Anthem restricted the availability of I.R.'s treatment by forcing it to comply with requirements contained only within proprietary criteria.

83. L.F. argued that not only did Anthem exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. L.F. requested to be provided with these criteria if they existed, but Anthem ignored this request.

84. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

85. Anthem and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Anthem and the Plan were not in compliance with MHPAEA.

86. In fact, despite L.F.'s request that Anthem and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Anthem and the Plan have not provided L.F. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Anthem and the Plan have not provided L.F. with any information about the results of this analysis.

87. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for her loss arising out of the Defendant's violation of MHPAEA.

88. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1.     Judgment in the total amount that is owed for I.R.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.     Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3.     Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

19

4.      For such further relief as the Court deems just and proper.

DATED this 23rd day of  June, 2022.


By ____s/ Brian S. King_____
                   Brian S. King
                   Attorney for Plaintiff



County of Plaintiff's Residence:
Boulder County, Colorado